J-A21036-25

2025 PA Super 259

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| v. | : | |
| KYLE HILL | : | |
| Appellant | : | No. 975 MDA 2024 |

Appeal from the Judgment of Sentence Entered December 19, 2023
In the Court of Common Pleas of Cumberland County Criminal Division at
No(s): CP-21-CR-0002041-2022

BEFORE:   PANELLA, P.J.E., LANE, J., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.:                    **FILED: NOVEMBER 14, 2025**

Appellant Kyle Hill appeals the judgment of sentence entered by the Court of Common Pleas of Cumberland County after a jury convicted Appellant of Drug Delivery Resulting in Death, Criminal Conspiracy to Commit Drug Delivery Resulting in Death, Involuntary Manslaughter, Criminal Conspiracy to Commit Involuntary Manslaughter, three counts of Possession with Intent to Deliver a Controlled Substance (PWID), and related charges.  We affirm.

The trial court summarized the factual background of this case as follows:

> On the morning of May 11, 2022, members of the Silver Spring Township Police Department responded to 6615 Carlisle Pike, Apartment #7 to investigate a possible overdose.  Therein, lying non-responsive on the floor of her bedroom, was the victim, Lindsay Bowen [("Bowen")], who – despite multiple attempts at revival by means of Narcan and otherwise – was soon pronounced dead.  It would be determined that she had succumbed to acute

---

[*] Former Justice specially assigned to the Superior Court.

fentanyl toxicity sometime before the arrival of the police.[1]  The victim's live-in fiancée, Randy Jacobs, had placed the initial report after finding her unconscious that morning.  He informed the police that [Bowen] had been using heroin[2] the previous night, which he suspected to have been supplied by [Appellant] and his then-roommate and one-time co-defendant, Michaella Weidler [("Weidler")], who resided in Apartment #3 of the same complex.  Among other paraphernalia located in the Bowen-Jacobs apartment was a used but empty glassine baggy bearing a "money bag" design and tucked into the plastic wrapping of [Bowen's] cigarette pack.  Notably, no other sources of heroin were found in the victim's residence.

Later that day, a search warrant for [Appellant's] apartment was executed by Silver Spring Township Police and members of the Cumberland County Drug Task Force, who discovered *inter alia* a large number of unused baggies with the same "money bag" design, 2.4 grams of fentanyl,[3] and a digital scale.  [Appellant] was interviewed by the police on the same day, at which time he admitted selling methamphetamine, while insisting that the sale of heroin was [Weidler's] affair alone.  In contrast, [Weidler], having entered a negotiated guilty plea, would later testify at trial that she and [Appellant] had been jointly selling methamphetamine and heroin, both of which they had sold to [Bowen] in the days preceding her death; that [Appellant] was in the habit of ordering the drugs from an online marketplace of some kind; that [Appellant] would package the drugs using "money bag" baggies; and that the "heroin" for sale at that time was actually fentanyl, which was [Bowen's] opiate of choice.

Electronic communications admitted at trial shed further light on the interactions between [Appellant], [Weidler], and [Bowen] in the hours leading up to the overdose.  In particular, these evidence two transactions on May 10, 2022: one in the

---

[1] Bowen's autopsy revealed that she had a level of 8.7 nanograms per milliliter of fentanyl in her blood, which was an extremely high level of toxicity.  Notes of Testimony (N.T.), 10/17/23, at 127-142.

[2] The trial court noted the "the term 'heroin' is often used generically in reference to any strong opiate."  Trial Court Opinion (T.C.O.), 11/19/24, at 3.

[3] Detective Anthony Fiore testified that fentanyl is so potent that 2.4 grams would yield seventy portions for individual use.  N.T., 10/17/23, at 77-95, 124-25.  Officers also recovered methamphetamine and counterfeit controlled substances designed to appear as Xanax pills.

afternoon and another in the evening. With respect to the former, [Weidler] messaged [Bowen] at 10:20 a.m. as follows: "Do you still want dope?? Kyle has more at the house it's there if you want it." Following nearly two hours of somewhat confused back-and-forth discussion about this, with [Weidler] intermediating between Kyle and [Bowen], [Bowen] indicated at 12:07 p.m. that she had paid Kyle via Cash App. A similar timeline emerges from the contemporaneous text messaging between [Bowen] and [Appellant] between 10:37 a.m. and 12:45 p.m., with several hours of coordinating discussion followed by [Bowen] coming down to "grab," per [Appellant's] instructions. That the sale was actually completed is corroborated by the victim's payment of $20 to "K Hill" via Cash App at 12:04 p.m.

[Later that evening,] [Bowen] was engaged in text conversations with both [Weidler] (8:08 p.m. to 9:12 p.m.) and [Appellant] (8:32 p.m. to 9:11 p.m.), coordinating a heroin purchase, which [was] apparently consummated in [Appellant's] apartment, where [Bowen] intended to take a "shot" (i.e., inject opioids). The transaction is once again confirmed by Cash App records, which show that the victim made two payments to "K Hill" totaling $66 at 8:17 p.m. and 9:16 p.m. that evening.

T.C.O. at 1-6 (citations omitted). The prosecution also obtained footage from the Ring camera installed at the front door of Appellant's apartment, which recorded (1) Appellant leaving packages under his door mat which Bowen picked up in the afternoon on May 10, 2022 and (2) Bowen entering Appellant's apartment on the evening of May 10, 2022.

In July 2022, Appellant was arrested and charged with Drug Delivery Resulting in Death, Criminal Conspiracy to Commit Drug Delivery Resulting in Death, Criminal Use of a Communication Facility, three counts of PWID, three counts of Conspiracy to Commit PWID, Involuntary Manslaughter, Conspiracy to Commit Involuntary Manslaughter, Hindering Apprehension or Prosecution, three counts of Possession of a Controlled Substance, and Possession of Drug

Paraphernalia. The trial court appointed Jacob M. Jividen, Esq., to represent Appellant in his defense of these charges.

On December 21, 2022, Appellant filed an omnibus pretrial motion, which included, *inter alia*, a motion to suppress evidence obtained from the search of his apartment. Appellant filed a supplemental omnibus pretrial motion on February 21, 2023. On June 1, 2023, the trial court denied Appellant's motion to suppress the items obtained in the search of his apartment. On June 2, 2023, the trial court vacated Attorney Jividen's appointment and appointed Allen Welch, Esq. as Appellant's counsel.

Appellant proceeded to a jury trial, which was held on October 16-18, 2023. At the conclusion of the trial, the jury convicted Appellant on all counts. On October 31, 2023, Appellant filed a *pro se* motion indicating that he wished to represent himself at sentencing. On November 29, 2023, the trial court held a **Grazier** hearing at which Appellant submitted to a colloquy and was granted leave to proceed *pro se* at sentencing.[4]

On December 19, 2023, the trial court imposed an aggregate sentence of thirteen to twenty-six years' imprisonment. At the sentencing hearing, the trial court extended Appellant's deadline for filing a post-sentence motion to January 19, 2024.[5] Order, 12/22/23, at 1. On January 10, 2024, Appellant

---

[4] **See Commonwealth v. Grazier**, 552 Pa. 9, 713 A.2d 81 (1998).

[5] Our courts have recognized that a trial court has the authority to grant a defendant an extension of time to file a post-sentence motion. **Commonwealth v. Moore**, 978 A.2d 988 (Pa.Super. 2009) (citing **Commonwealth v. Dreves**, 839 A.2d 1122 (Pa.Super. 2003) (*en banc*)).

filed a *pro se* post-sentence motion. However, on January 17, 2024, Appellant requested the appointment of counsel to seek "input in the potential amendment or supplementation of the post sentence motion he filed." On January 30, 2024, the trial court appointed Shannon Costa, Esq., to represent Appellant.

On April 2, 2024, Appellant filed a supplemental post-sentence motion, raising multiple new claims including allegations of the ineffective assistance of trial counsel. At the April 8, 2024 post-sentence motion hearing, Appellant acknowledged the general rule set forth by our Supreme Court in ***Commonwealth v. Grant***, 572 Pa. 48, 813 A.2d 726, 738 (2002), which provides that "a petitioner should wait to raise claims of ineffective assistance of trial counsel until collateral review." Nevertheless, Appellant asserted that he would waive his right to raise ineffectiveness claims in a future PCRA petition to obtain review of his ineffectiveness claims in the post-sentence motion. The trial court directed the parties to submit briefs on this issue and scheduled another post-sentence motion hearing for April 29, 2024.

At the April 29, 2024 post-sentence motion hearing, the trial court determined that there was good cause to review the merits of Appellant's ineffectiveness claims at that juncture. The trial court also conducted an oral waiver colloquy and determined that Appellant understood that he would be "foregoing the right to claim ineffectiveness of counsel in any future PCRA petition." N.T., 4/29/24, at 4-6. The trial court then held an evidentiary hearing on Appellant's ineffectiveness claims.

On June 10, 2024, the trial court entered an order denying Appellant's post-sentence motion in its entirety. On July 8, 2024, Appellant filed a notice of appeal.[6] On July 9, 2024, the trial court directed Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). On July 30, 2024, Appellant submitted his timely Rule 1925(b) statement.

Appellant raises the following issues for our review:

A. Did the Honorable Trial Court err in denying Appellant a judgment of acquittal on the basis that the verdict was supported by insufficient evidence?

B. Did the Honorable Trial Court err in denying Appellant a new trial on the basis that the verdict was against the weight of the evidence?

_____

[6] We must determine whether this appeal was timely filed as "[j]urisdiction is vested in the Superior Court upon the filing of a timely notice of appeal." *Commonwealth v. Nahavandian*, 954 A.2d 625, 629 (Pa.Super. 2008). If a defendant files a timely post-sentence motion, the defendant is required to file a notice of appeal within thirty days of the date that the motion is denied, either by the trial court or by operation of law. Pa.R.Crim.P. 720(A)(2). Rule 720 provides that a trial court "shall decide the post-sentence motion, including any supplemental motion, within 120 days of the filing of the motion." Pa.R.Crim.P. 720(B)(3)(a). "Upon motion of the defendant within the 120-day disposition period, for good cause shown, the judge may grant one 30-day extension for decision on the motion." Pa.R.Crim.P. 720(B)(3)(b). Appellant filed a timely *pro se* post-sentence motion on January 10, 2024 and a supplemental counseled motion on April 2, 2024. At that point, the trial court was required to resolve the post-sentence motion by May 9, 2024 or 120 days from the filing of the initial motion. However, the trial court granted Appellant's request for a 30-day extension of the post-sentence motion time period. N.T., 4/29/24, at 4. The trial court's order entered on Monday, June 10, 2024 denying Appellant's post-sentence motion was filed within 150 days of the original post-sentence motion. *See* 1 Pa.C.S.A. § 1908 ("[w]henever the last day of any … period shall fall on a Saturday or Sunday, or on any day made a legal holiday…, such day shall be omitted from the computation"). Accordingly, Appellant timely filed his notice of appeal within thirty days of the trial court's denial of his post-sentence motion.

C. Did the Honorable Trial Court err in determining that Appellant's rights were not violated by the Commonwealth's non-disclosure or destruction of evidence?

D. Did the Honorable Trial Court err in declining to reconsider its Order dated June 1, 2023 (denying motion to suppress evidence obtained in connection with search of Appellant's apartment)?

E. Did the Honorable Trial Court err in imposing Appellant's sentence insofar as it failed to properly consider certain mitigating factors?

F. Did the Honorable Trial Court commit an abuse of discretion in denying Appellant bail following his sentencing?

G. Did the Honorable Trial Court err and commit an abuse of discretion in determining that Appellant's trial counsel, Allen Welch, Esquire, was not ineffective for several enumerated reasons?

Appellant's Brief, at 7-8 (reordered for review).

### *Challenges to the Sufficiency of the Evidence*

Appellant first challenges the sufficiency of the evidence supporting his convictions for Drug Delivery Resulting in Death, Conspiracy to Commit Drug Delivery Resulting in Death, Involuntary Manslaughter, and Conspiracy to Commit Involuntary Manslaughter.[7]   Our review of Appellant's sufficiency challenges is guided by the following standard of review:

> Our applicable standard of review is whether the evidence admitted at trial, and all reasonable inferences drawn from that evidence, when viewed in the light most favorable to the Commonwealth as verdict-winner, was sufficient to enable the fact-finder to conclude that the Commonwealth established all of

---

[7] While Appellant's brief sets forth a vague sufficiency claim in the statement of questions involved, his Rule 1925(b) statement specified he was arguing that the text messages and Ring camera evidence showed only Appellant's co-defendant, Weidler, should have faced criminal liability for Bowen's death.

the elements of the offense beyond a reasonable doubt. Additionally, when examining sufficiency issues, we bear in mind that: the Commonwealth's burden may be sustained by means of wholly circumstantial evidence; the entire trial record is evaluated and all evidence received against the defendant considered; and the trier of fact is free to believe all, part, or none of the evidence when evaluating witness credibility.

This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt. Although a conviction must be based on more than mere suspicion or conjecture, the Commonwealth need not establish guilt to a mathematical certainty.

*Commonwealth v. Rodriguez*, 340 A.3d 334, 347 (Pa.Super. 2025) (citation omitted).

In considering Appellant's sufficiency challenges, we set forth the statutes under which Appellant was convicted. The charge of Drug Delivery Resulting in Death is set forth at 18 Pa.C.S.A. § 2506, which states:

**(a) Offense defined.—**A person commits a felony of the first degree if the person intentionally administers, dispenses, delivers, gives, prescribes, sells or distributes any controlled substance or counterfeit controlled substance in violation of section 13(a)(14) or (30) of the act of April 14, 1972 (P.L. 233, No. 64), known as The Controlled Substance, Drug, Device and Cosmetic Act, and another person dies as a result of using the substance.

18 Pa.C.S.A. § 2506(a) (footnote omitted). Thus, "[t]he crime described above consists of two principal elements: (i) [i]ntentionally administering, dispensing, delivering, giving, prescribing, selling or distributing any controlled substance or counterfeit controlled substance[,] and (ii) death caused by ('resulting from') the use of that drug." *Commonwealth v. Carr*, 227 A.3d 11, 15 (Pa.Super. 2020) (citation omitted).

Conspiracy is defined in 18 Pa.C.S.A. § 903, in relevant part, as follows:

(a) Definition of conspiracy.—A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

(1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

(2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime....

(e) Overt Act.—No person may be convicted of conspiracy to commit a crime unless an overt act in pursuance of such conspiracy is alleged and proved to have been done by him or by a person with whom he conspired.

18 Pa.C.S.A. § 903. Our courts have set forth the following elements of a conspiracy charge:

To sustain a conviction for criminal conspiracy, the Commonwealth must establish, beyond a reasonable doubt, that: (1) the defendant entered into an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal intent, and (3) an overt act was done in furtherance of the conspiracy. "This overt act need not be committed by the defendant; it need only be committed by a co-conspirator."

*Carr*, 227 A.3d at 14–15 (quoting *Commonwealth v. Smith*, 69 A.3d 259, 263 (Pa.Super. 2013) (citations omitted)).

Section 2504 of the Crimes Code provides that "[a] person is guilty of involuntary manslaughter when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner, he causes the death of another person." 18 Pa.C.S.A. § 2504. Our courts have also defined involuntary manslaughter

as (1) an act, (2) done with a reckless state of mind, that (3) causes the victim's death. ***Commonwealth v. Huggins***, 575 Pa. 395, 836 A.2d 862, 865-68 (2003).

Appellant's sufficiency challenge is solely based on his contention that there is "insufficient evidence presented to show Appellant setting up and/or carrying out a heroin/fentanyl delivery to Ms. Bowen between May 10, 2022 and May 11, 2022." Appellant's Brief, at 16. Instead, Appellant contends that the evidence showed that Weidler was the only individual who set up and carried out a fentanyl delivery to Bowen on May 10, 2022. ***Id.*** As such, Appellant is essentially arguing that he cannot be criminally liable for any of the charged crimes as he contends that the prosecution presented insufficient evidence to identify Appellant as the individual that physically delivered the controlled substance that caused Bowen's death. We cannot agree.

The Commonwealth presented substantial evidence to allow the jury to find that Appellant delivered Bowen controlled substances in two separate transactions on May 10, 2022, the day of Bowen's death. With respect to the first transaction, text messages show that on May 10, 2022, at approximately 11:00 a.m.,[8] Bowen arranged to buy "bags" of a controlled substance from Appellant, who left the bags under the mat at his front door and directed Bowen to come "grab" them. N.T., 10/17/23, at 172-79; Commonwealth Exh.

---

[8] Detective Phillips testified that the Cellebrite cell phone extraction reported text messaging in UTC ("Coordinated Universal Time"), which is four hours ahead of Eastern Standard Time (EST). N.T., 10/17/23, at 174. We have converted all times reported in UTC to EST.

67. Shortly thereafter, Bowen sent a text message to Appellant indicating she was at his front door and then sent Appellant payment to one of his Cash App accounts.[9]  Bowen assured Appellant that he and Weidler could be her "MAIN connect," likely meaning her exclusive source for controlled substances. Commonwealth Exh. 67.

Although Appellant claims he only left Bowen cigarettes and Xanax under his doormat on May 10, 2022,[10] the prosecution presented evidence to allow the jury to find that the content of the "bags" Appellant sold Bowen at contained methamphetamine or heroin/fentanyl bundles, as confirmed through text messages that Bowen had simultaneously sent to Weidler.  Just a few minutes earlier, at 10:20 a.m, the two women were arranging a sale of controlled substances, and Weidler advised Bowen that she should get the drugs from Appellant as Weidler was not home.  Weidler asks Bowen if she

_____

[9] The prosecution also presented footage from the Ring doorbell camera on Appellant's front door, which showed Appellant putting items under his doormat and Bowen arriving at Appellant's apartment with her children to pick the items up from the doormat a short time later.  In its Rule 1925(a) opinion, the trial court discounts the evidentiary value of the Ring camera footage as its time stamp markings did not allow for the jury to easily determine what time the events occurred.   It appears that investigators had replaced the native time stamps with descriptive labels such as "Lindsay Arrives." T.C.O. at 5, n. 19.  However, Appellant conceded that the Ring camera footage had recorded Bowen picking up items he had left under his doormat for her on May 10, 2022.  N.T., 10/18/23, at 19.  Further, we agree with the trial court that reliance on the Ring camera footage is unnecessary as there is ample evidence to establish Appellant's guilt on the relevant charges.
[10] In subsequent correspondence with Attorney Welch, Appellant claimed that he simply left Bowen clean syringes under the mat, which is inconsistent with his trial testimony that he left cigarettes and Xanax.

"still want[ed] dope," told Bowen that "Kyle has more at the house it's there if you want it," and that it was the "same stuff I gave you earlier." N.T., 10/17/23, at 32-33; Commonwealth Exh. 62. At 10:41 a.m., Weidler assured Bowen that Appellant "should have some ice left and he def has dope." N.T., 10/17/23, at 38; Commonwealth Exh. 62. Weidler testified at trial that she used the term "ice" for methamphetamine and "dope" for heroin/fentanyl bundles. N.T., 10/17/23, at 25, 30, 34. Weidler testified that she and Appellant would routinely sell Bowen heroin and methamphetamine, but clarified that "fentanyl was Bowen's drug of choice." *Id.* at 16-17.

In a second transaction later that evening, Bowen's text messages show she was again simultaneously texting both Appellant and Weidler to arrange to obtain heroin/fentanyl from the couple. Appellant's text messages show that he directed Bowen to come to his apartment at approximately 7 p.m. on May 10, 2022 to inject heroin/fentanyl. Appellant and Bowen participated in the following text message exchange:

> [Bowen:] I thank ur girls mad cause I helped you. And I was buying 4 bags and a little ice and now she wont respond, I'm not sure what I did wrong? I thought ya'll was a team. …
>
> [Appellant:] I'm getting the other 5hing ready now famm.
>
> [Bowen:] Am I able to come in an do a shot? I got my own riggy.
>
> [Appellant:] Come down.

*Id.* at 180; Commonwealth Exh. 67. Weidler testified that Bowen then came to Appellant and Weidler's apartment to "shoot" or inject herself with a syringe of fentanyl, which was provided by Appellant. Bowen sent two payments

totaling $66 to Appellant's Cash App account at 8:17 p.m. and at 9:16 p.m., respectively. Detective Phillips testified that the Ring camera on Appellant's front door captured Bowen entering Appellant and Weidler's apartment after this text exchange.[11]

The trial court surmised that the evening transaction on May 10, 2022 was presumably the exchange in which Bowen received the fentanyl that led to her fatal overdose, noting the last sign of life from Bowen was her attempt to contact Appellant in the early morning hours of May 11, 2022. Appellant admitted that he received a text message from Bowen at 3:58 a.m. While Appellant responded to Bowen's message, he did not receive another text message from Bowen. In the morning, Jacobs, Bowen's fiancée, found Bowen deceased on a mattress near drug paraphernalia and contacted emergency personnel at approximately 8:30 a.m.

As noted above, responding officers recovered a glassine baggie with the "money bag" symbol from Bowen's cigarette pack. It was reasonable for the jury to infer that the "money bag" baggie in Bowen's possession came from Appellant, whose apartment contained a large quantity of unused glassine baggies with the same "money bag" design, a digital scale with white residue on it, as well as over two grams of fentanyl, twenty-one grams of

---

[11] As noted above, while the trial court discounted the evidentiary value of the Ring camera footage due to the difficulty of determining what time the events actually occurred, Appellant admits that the Ring camera footage did accurately depict Bowen entering his apartment on the evening of May 10, 2022, after Appellant indicated that Bowen could come in and "take a shot."

methamphetamine, and pills determined to be counterfeit controlled substances. As noted above, the amount of controlled substances found in Appellant's apartment would be sufficient to make 70 bags of fentanyl and 22 bags of methamphetamine to sell for individual use. Given the large amount of drugs in Appellant's apartment along with the empty packaging material and digital scale, there was sufficient evidence to infer that Appellant was involved in the sale of controlled substances, and specifically, fentanyl.

As the Commonwealth presented evidence that Appellant was involved in the sale of controlled substances, provided Bowen fentanyl on the day before her overdose, and received payment for such drugs, there is sufficient evidence to show that Appellant delivered the fentanyl that ultimately caused Bowen's death, which was ruled to be the result of acute fentanyl toxicity.

We recognize that Appellant claims there is insufficient evidence to determine whether Appellant or Weidler delivered the fentanyl to Bowen that ultimately led to her death. Appellant fails to understand the ramifications of the fact that he was convicted of *Conspiracy* to Commit Drug Delivery Resulting in Death and *Conspiracy* to Commit Involuntary Manslaughter.[12] In such circumstances, the following principles are applicable:

_____

[12] We note that our courts have held that both crimes are cognizable offenses in Pennsylvania. **See Commonwealth v. Carr**, 227 A.3d 11, 18 (Pa.Super. 2020) ("the crime of conspiracy to commit drug delivery resulting in death is a cognizable crime"); **Commonwealth v. Arrington**, 247 A.3d 456, 460–61 (Pa.Super. 2021) ("Conspiracy to Commit Involuntary Manslaughter is a cognizable offense in Pennsylvania").

> Once there is evidence of the presence of a conspiracy, conspirators are liable for acts of co-conspirators committed in furtherance of the conspiracy. ***Commonwealth v. Stocker**,* 424 Pa.Super. 189, 622 A.2d 333, 342 (1993). Even if the conspirator did not act as a principal in committing the underlying crime, he is still criminally liable for the actions of his co-conspirators taken in furtherance of the conspiracy. ***Commonwealth v. Soto**,* 693 A.2d 226, 229–230 (Pa.Super. 1997), *appeal denied,* 550 Pa. 704, 705 A.2d 1308 (1997). ***See also**,* 18 Pa.C.S.A. § 306.

>> The general rule of law pertaining to the culpability of conspirators is that each individual member of the conspiracy is criminally responsible for the acts of his co-conspirators committed in furtherance of the conspiracy. The co-conspirator rule assigns legal culpability equally to all members of the conspiracy. All co-conspirators are responsible for actions undertaken in furtherance of the conspiracy regardless of their individual knowledge of such actions and regardless of which member of the conspiracy undertook the action.

> ***Commonwealth v. Galindes**,* 786 A.2d 1004, 1011 (Pa.Super. 2001).

>> The premise of the rule is that the conspirators have formed together for an unlawful purpose, and thus, they share the intent to commit any acts undertaken in order to achieve that purpose, regardless of whether they actually intended any distinct act undertaken in furtherance of the object of the conspiracy. It is the existence of shared criminal intent that "is the sine qua non of a conspiracy."

> ***Commonwealth v. Wayne**,* 553 Pa. 614, 720 A.2d 456, 463–464 (1998), *cert. denied,* 528 U.S. 834, 120 S.Ct. 94, 145 L.Ed.2d 80 (1999) (citations omitted).

***Commonwealth v. Lambert***, 795 A.2d 1010, 1016–17 (Pa.Super. 2002) (*en banc*). "Conspirators need not contemplate the ultimate crime in order to be charged and convicted of conspiracy to commit that crime." ***Carr***, 227 A.3d at 17.

Our review of the record shows that Appellant and Weidler, who lived together as romantic partners, were engaged in a criminal enterprise of selling controlled substances. Weidler testified that Appellant obtained heroin/ fentanyl bundles and methamphetamine online through the black market and had the drugs shipped to their apartment or the homes of other individuals, including Appellant's grandmother. Weidler indicated that Appellant would package the drugs into baggies with the "money bag" design that Appellant himself had admittedly purchased. Weidler averred that Appellant secured the drugs in his safe to which only he had access. The pair would accept electronic payment for the drugs through Appellant's Cash App accounts.

Text messages show that Appellant and Weidler worked together to consummate drug transactions with Bowen, who viewed Appellant and Weidler as a "team" and promised that the couple would be her exclusive source to obtain her drug of choice, fentanyl.

Appellant himself made key admissions which connected him to the sale of methamphetamine and heroin/fentanyl bundles. Appellant expressly admitted that he had possession of both fentanyl and methamphetamine in his apartment. Appellant conceded that he had exclusive access to the safe in his apartment where the drugs were kept and admitted that he supplied the money for Weidler to purchase the "money bag" glassine baggies that were used in the sale and delivery of controlled substances. Further, Bowen sent money to Appellant's Cash App accounts when she purchased controlled substances.

As a result, we find there was sufficient evidence to establish that Appellant and Weidler, in furtherance of their criminal enterprise of selling fentanyl, committed the overt act of selling Bowen fentanyl in the hours before her fatal overdose. Even assuming Weidler delivered the source of fentanyl to Bowen that led to her overdose, Appellant was criminally liable for Weidler's act committed in furtherance of their conspiracy, sharing legal culpability for Drug Delivery Resulting in Death, Involuntary Manslaughter, and the related crimes. Accordingly, we conclude that the trial court did not err in denying Appellant's challenge to the sufficiency of the evidence.

### *Challenge to the Weight of the Evidence*

Appellant also claims on appeal that his convictions are against the weight of the evidence. Our standard of review for challenges to the weight of the evidence is well-established:

> The essence of appellate review for a weight claim appears to lie in ensuring that the trial court's decision has record support. Where the record adequately supports the trial court, the trial court has acted within the limits of its discretion.
>
> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.
>
> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court. Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.

*Commonwealth v. Windslowe*, 158 A.3d 698, 712 (Pa.Super. 2017) (citations omitted).

In his challenge to the weight of the evidence, Appellant would have this Court believe that the evidence shows that he was merely a drug addict in possession of drugs and paraphernalia whereas Weidler was the sole perpetrator in delivering fentanyl to Bowen. Appellant attempts to diminish his criminal responsibility by arguing that Weidler was the mastermind behind all the drug sales and he merely provided his Cash App accounts for her use. Appellant asserts that it was Weidler who arranged the second transaction to sell Bowen fentanyl on the evening of May 10, 2022, which led to her overdose in the morning hours of May 11, 2022.

Our review of the record supports the trial court's decision to deny Appellant's challenge to the weight of the evidence. In finding that the jury's verdict did not shock its conscience, the trial court explained that "[w]hile we are inclined to agree with [Appellant] that [Weidler] played a significant role in arranging the fatal transaction, a role that she may well have understated for obvious reasons, her involvement in no way negates his own [criminal responsibility]." T.C.O. at 7.

While Appellant asks this Court to reweigh the evidence and accept his version of the events in question, we may not substitute our judgment for that of the factfinder. It is well-established that "[t]he weight of the evidence is exclusively for the finder of fact, who is free to believe all, none[,] or some of the evidence and to determine the credibility of the witnesses."

*Commonwealth v. Spence*, 290 A.3d 301, 311 (Pa.Super. 2023) (*quoting Commonwealth v. Talbert*, 129 A.3d 536, 545 (Pa.Super. 2015)). As a result, we conclude that the trial court did not abuse its discretion in denying Appellant's challenge to the weight of the evidence.

### *Allegation of Brady Violations*

Appellant next argues that he is entitled to a new trial based on his suggestion that the prosecution violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) by failing to provide the defense with certain evidence that tended to be exculpatory in nature.

In reviewing a trial court's denial of a new trial based on a *Brady* claim, we recognize that this issue presents a question of law, for which our standard of review is *de novo* and our scope of review is plenary. *Commonwealth v. Bagnall*, 661 Pa. 123, 139, 235 A.3d 1075, 1084 (2020). It is well-established that the *Brady* decision and subsequent precedent flowing therefrom "imposes upon a prosecutor the obligation to disclose all favorable evidence that is material to the guilt or punishment of an accused, even in the absence of a specific request by the accused." *Id.* at 141, 235 A.3d at 1085–86 (citing *Commonwealth v. Strong*, 563 Pa. 455, 761 A.2d 1167, 1171 & n.5 (2000)). Our Supreme Court has provided that, in order to establish a *Brady* violation:

> a defendant must show that: (1) evidence was suppressed by the state, either willfully or inadvertently; (2) the evidence was favorable to the defendant, either because it was exculpatory or because it could have been used for impeachment; and (3) the evidence was material, in that its omission resulted in prejudice

- 19 -

to the defendant. **See Commonwealth v. Lambert**, 584 Pa. 461, 471, 884 A.2d 848, 854 (2005); **Commonwealth v. Collins**, 585 Pa. 45, 68, 888 A.2d 564, 577–78 (2005). However, "the mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense." **Commonwealth v. Chambers**, 570 Pa. 3, 29, 807 A.2d 872, 887 (2002) (citation omitted and emphasis added). Rather, evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." **Id**. at 29, 807 A.2d at 887–88.

**Commonwealth v. Willis**, 616 Pa. 48, 46 A.3d 648, 656 (2012) (internal citation omitted).

Our courts have clarified that "[w]hen the [Commonwealth] fails to preserve evidence that is 'potentially useful,' there is no federal due process violation 'unless a criminal defendant can show bad faith on the part of the police.'" **Commonwealth v. Donoughe**, 243 A.3d 980, 984–85 (Pa.Super. 2020) (*quoting* **Commonwealth v. Chamberlain,** 612 Pa. 107, 30 A.3d 381, 402 (2011), *quoting* **Arizona v. Youngblood,** 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), *cert. denied,* 566 U.S. 986, 132 S.Ct. 2377, 182 L.Ed.2d 1017 (2012)).[13]

---

[13] Although Appellant does not specifically claim that the Commonwealth violated his right to due process under the Pennsylvania Constitution, this Court has similarly held that "the Pennsylvania Constitution provides no more due process than does the U.S. Constitution in the context of lost evidence." **Donoughe**, 243 A.2d at 985 (*quoting* **Commonwealth v. Coon,** 26 A.3d 1159, 1163 (Pa.Super. 2011) (finding appellant did not establish **Brady** claim under federal and Pennsylvania due process clauses when the appellant failed to show bad faith on part of the State Police in disposing "potentially useful evidence")).

Specifically, Appellant asserts that the Commonwealth withheld material evidence from the defense in failing to preserve and provide 1) items discovered in trash bags in the parking lot of the apartment complex, 2) body camera footage from officers conducting searches of Appellant's apartment and Bowen's apartment, and 3) extraction data from Randy Jacobs's cell phone. We address each alleged **Brady** violation in turn.

Appellant first asserts that the Commonwealth committed a **Brady** violation by destroying or failing to retain items contained in a communal trash area in the parking lot of the apartment complex where both Appellant and Bowen resided. It is undisputed that the Commonwealth did not preserve items contained within two separate trash bags that officers admittedly discovered during a search of the communal trash area, which they viewed as irrelevant to the charges in the instant case. The Commonwealth did provide the defense with video from the body cameras worn by the officers searching the communal trash area.

One of trash bags (which was entirely black) contained empty glassine baggies without the "money bag" design, a used syringe, and a medical marijuana card belonging to an unrelated female. However, we fail to see how this trash bag contains any relevant evidence as it could not be reasonably connected to anyone involved in this case. The only inference that could be made from the discovery of this bag is that an unknown individual discarded items related to drug use at an unknown time in the communal trash area of the apartment complex.

The other trash bag (which was black with blue handles) contained a piece of mail addressed to the victim's child, a ball of tinfoil that appeared to have been used to smoke opiates, and a discarded Narcan unit. We agree with the trial court's finding that this trash bag could be associated with the victim as her residence contained matching trash bags and the bag in question contained correspondence to the victim's child.

However, even assuming that the tinfoil and Narcan packaging were related to the victim's fatal overdose and her fiancée's failed efforts to revive her with Narcan, these items do not constitute exculpatory evidence which would relieve Appellant of criminal liability for Drug Delivery Resulting in Death or any of the other charges. The items would not show the fentanyl that led to the victim's fatal overdose came from a source other than Appellant. As reiterated above, the victim, who died from acute fentanyl toxicity was found to possess a glassine baggie labeled with a "money bag" design that could be connected to Appellant and Weidler. The victim's text messages showed that she was communicating with Appellant in the hours before her overdose to obtain fentanyl.

Appellant also suggests that the Narcan packaging in the trash somehow could have impeached Jacobs' testimony that he attempted to revive Bowen with Narcan when he found her unresponsive on the morning of May 11, 2023. In this section of his brief, Appellant does not develop any cogent argument as to how exactly this evidence would be used to impeach Jacobs, we decline to review this claim further. Further, we fail to see how the items contained

in the trash bag constituted material evidence, in that had it been disclosed to the defense, that the result of this proceeding would have been different.

Appellant's second alleged *Brady* violation involves his contention that the Commonwealth never provided the defense with body camera footage from the officers who executed the search warrants for Appellant's and the victim's apartments. In response, the Commonwealth has claimed that such evidence does not exist as the officers who were conducting the searches were members of the Cumberland County Drug Task Force that did not wear body cameras.

In resolving this issue, the trial court remarked that it found that "the truth lies somewhere in between these two positions." T.C.O. at 10. In reviewing the search warrant returns and footage from Appellant's Ring camera, the trial court determined that the search warrants were "executed in two phases by two groups of officers – one tasked with securing the premises [and] the other with searching them." *Id.* at 11. The trial court found that "the line between these phases and groups is not particularly crisp," noting that at least one of the officers involved in the search of Appellant's apartment was wearing a body camera. Further, the trial court pointed out that the officers who entered Appellant's apartment and secured the premises were wearing body cameras. Thus, the trial court found that there was body camera footage from officers inside Appellant's apartment, even if those particular officers were simply "milling about" before the official search was set to begin.

However, the trial court emphasized that Appellant had not made any arguments to substantiate his claim that the missing body camera footage contained exculpatory evidence. We agree that Appellant has only speculated about the possible exculpatory evidence that the missing body camera footage could provide. Our courts have required support for an allegation that destroyed evidence was exculpatory, holding it cannot be based on a "mere assertion." *Commonwealth v. Snyder*, 599 Pa. 656, 672, 963 A.2d 396, 405 (2009) (*quoting Commonwealth v. Small*, 559 Pa. 423, 441–42, 741 A.2d 666, 676 (1999)). On the other hand, we acknowledge that the Commonwealth's failure to preserve this footage prevented Appellant from establishing that it contained material evidence that proved to be exculpatory or impeaching.

Nevertheless, even to the extent that the body camera footage contained "potentially useful" evidence, the trial court made a specific finding that Appellant did not make any showing that the prosecution acted in bad faith in failing to preserve this evidence for the defense. The trial court noted that investigators promptly provided the defense with extensive documentation of both searches through a police photographer who took 274 images of the search of Appellant's apartment and 221 images of the search of the victim's apartment. As such, the record supports the trial court's finding that the police did not act in bad faith in failing to preserve the limited body camera footage that was recorded during the search process.

Appellant's third alleged **Brady** violation involves his contention that the Commonwealth failed to turn over extraction data for the cell phone of Randy Jacobs (Bowen's fiancée). Appellant argues that Jacobs' cell phone contained four photographs of the victim lying down in a "clearly overdosing" face-down position: two photos taken on the evening of May 10, 2022 at 10:52 p.m. and 11:06 p.m., and two photos taken on the morning of May 11, 2022, at 8:30 a.m. Appellant argues that these photos show that Bowen overdosed and died on the evening of May 10, 2022 as opposed to the morning of May 11, 2022, when Jacobs called the police. Appellant alleges that these photos show that Jacobs should have been charged with manslaughter for isolating Bowen in their apartment while she was intoxicated and deprived of assistance.

The trial court found that the Commonwealth had inadvertently omitted the extraction data from Jacobs' phone from the flash drive it provided to Attorney Jividen, Appellant's original trial counsel. Even assuming that the Commonwealth did fail to provide the cell phone extraction data to the defense in discovery,[14] we find there was no **Brady** violation as Appellant has failed to

---

[14] The Commonwealth continues to maintain on appeal it had promptly provided the defense the extraction data from Jacobs' cell phone on the flash drive. The Commonwealth points out that it provided a discovery letter to the defense outlining the contents of the flash drive, which indicated that it contained the relevant Cellebrite extraction report. N.T., 4/29/24, at 26. At the post-sentence motion hearing, Attorney Jividen testified that he made copies of the discovery materials on another flash drive for Appellant and a hard drive that was ultimately turned over to the trial court administrator. N.T., 4/29/24, at 28-29. Attorney Jividen admitted that while he represented Appellant, he had no reason to believe he was missing any discovery materials from the prosecution. N.T., 4/29/24, at 27, 30.

establish that the extraction data from Jacobs' cell phone contained material evidence that was exculpatory or could have been used for impeachment.

While at first glance, it does seem peculiar that Jacobs took photos of his fiancée lying down motionless the night before her death, Jacobs explained to detectives that he took these photos of Bowen to show her in the morning what the drugs she was taking was doing to her. N.T. 4/8/24, at 122-23. We agree with the trial court's assessment that it is not possible to determine from any of the photographs whether the victim was in fact deceased or whether she was merely sleeping. T.C.O. at 18.

There is other evidence to show that Bowen had not overdosed on the evening of May 10, 2022. In the photos taken the morning of May 11, 2022, Bowen is wearing a different shirt than the photos taken on the evening of May 10, 2022. Appellant also admitted that the victim sent him a text message on the morning of May 11, 2022 at approximately 4 a.m., which was just four hours before she was found deceased. This corroborates Jacobs' assertion that he was not aware that Bowen had overdosed until he attempted to awake her at 8:30 a.m. on May 11, 2022.

Most importantly, Appellant's attempts to placing blame on Jacobs are simply misguided attempts to distract attention from the substantial evidence presented that showed that Appellant was responsible for providing fentanyl for Bowen's use which ultimately led to her death. We agree with the trial court that even if Bowen "was in fact already deceased on the night of the

10th, i.e. some time after she purchased fentanyl from [Appellant], that would not exculpate [Appellant]." T.C.O. at 18.

To the extent that Appellant suggests that this evidence could be used to show that Appellant's actions were not the legal cause of Bowen's death, Appellant is not entitled to relief. Our courts have held that:

> it has never been the law of this Commonwealth that criminal responsibility must be confined to a sole or immediate cause of death. Criminal responsibility is properly assessed against one whose conduct was a direct and substantial factor in producing the death even though other factors combined with that conduct to achieve the result.

*Commonwealth v. Fabian*, 60 A.3d 146, 152 (Pa.Super. 2013) (*quoting Commonwealth v. Skufca*, 457 Pa. 124, 321 A.2d 889, 894 (1974) (citation omitted)).

As noted above, Bowen's autopsy revealed that her cause of death was acute fentanyl toxicity. The Commonwealth has proven causation as Appellant's act of delivering fentanyl to Bowen was a direct and substantial factor in causing Bowen's death. As Appellant has failed to show that the Commonwealth withheld material exculpatory or impeachment evidence from the defense, the trial court did not err in denying Appellant's request for a new trial as no *Brady* violations occurred.

### Challenge to Refusal to Reconsider Denial of Suppression Motion

Appellant also claims that the trial court erred in declining to reconsider its order denying Appellant's motion to suppress evidence obtained in connection with search of his apartment.

Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Since the prosecution prevailed in the suppression court, we may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

***Commonwealth v. Abdul-Ali***, 333 A.3d 1059, 1068 (Pa.Super. 2025) (citation omitted).

Appellant argues that the trial court should have reconsidered its denial of his suppression motion as the search warrant for his apartment was not properly obtained. Specifically, Appellant argues that the affidavit of probable cause should be invalidated as it did not reference any of the items that officers discovered in the communal trash area of the apartment complex or include Jacobs' statements indicating that he administered Narcan to the victim before first responders arrived.

The Commonwealth objects to the review of this claim, pointing out that Appellant did not raise these specific arguments in his original suppression motion or at the suppression hearing, but raised them for the first time in his post-sentence motion.[15] Our rules of criminal procedure require that a motion to suppress "state specifically and with particularity ... the grounds for

_____

[15] Appellant did not offer any argument or analysis on appeal to challenge the trial court's original suppression ruling upholding the validity of the search warrant for Appellant's apartment.

- 28 -

suppression[ ] and the facts and events in support thereof." Pa.R.Crim.P. 581(D). "The requirement that a defendant raise the grounds for suppression in his or her suppression motion ensures that the Commonwealth is put on notice of what evidence it must produce at the suppression hearing in order to satisfy its burden of proving that the evidence was legally obtained." **Commonwealth v. Carper**, 172 A.3d 613, 619 (Pa.Super. 2017).

Rule 581, which governs suppression motions, provides "one single procedure for the suppression of evidence alleged to have been obtained in violation of the defendant's rights." Pa.R.Crim.P. 581, cmt. We recognize that a trial court may exercise discretion to file a supplemental suppression motion if "the opportunity did not previously exist, or the interests of justice otherwise require." Pa.R.Crim.P. 581; **Commonwealth v. Sodomsky**, 137 A.3d 620, 626 (Pa.Super. 2016) (citing **Commonwealth v. Williams**, 323 A.2d 862, 864 (Pa.Super. 1974)).

The trial court in this case declined to reconsider its original ruling denying Appellant's request to suppress the evidence obtained from the search of his home. The trial court did not give Appellant permission to raise new theories in a supplemental post-sentence motion. We find that the trial court did not err in denying Appellant's motion to relitigate his suppression motion under new legal theories after he was convicted at trial.

### Challenge to Discretionary Aspects of Sentence

Appellant next claims that the trial court erred in imposing his sentence without proper consideration of certain mitigating factors, including evidence

of Appellant's substance abuse disorder as well as his completion of various courses and programs while incarcerated.

In reviewing a challenge to the trial court's sentencing discretion, we are mindful that:

> Challenges to the discretionary aspects of sentencing do not entitle an appellant to an appeal as of right. Prior to reaching the merits of a discretionary sentencing issue[, w]e conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, **see** Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, **see** Pa.R.Crim.P. 720; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

**Commonwealth v. Manivannan**, 186 A.3d 472, 489 (Pa.Super. 2018) (quotation marks, some citations, and emphasis omitted).

Appellant filed a timely post-sentence motion and notice of appeal, but failed to include a statement of reasons for allowance of appeal from discretionary aspects of sentence pursuant to Pa.R.A.P. 2119(f). Rule 2119(f) requires the appellant to "set forth in his brief a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of a sentence." Pa.R.A.P. 2119(f). Nevertheless, the Commonwealth has not objected to Appellant's failure to provide a Rule 2119(f) statement. "Since the requirement of such a statement is procedural and not jurisdictional, the Commonwealth's failure to object to or otherwise assert the defect in the form of Appellant's brief has resulted in a waiver of the defect."

*Commonwealth v. Patterson*, 180 A.3d 1217, 1232 (Pa.Super. 2018) (*quoting Commonwealth v. Titus*, 816 A.2d 251, 255 (Pa.Super. 2003) (citations and internal quotation marks omitted)).

Therefore, we must determine whether Appellant's challenge to the discretionary aspects of his sentence constitutes a substantial question for our review. "[T]o establish a substantial question, the appellant must show actions by the trial court inconsistent with the Sentencing Code or contrary to the fundamental norms underlying the sentencing process. The determination of whether a particular case raises a substantial question is to be evaluated on a case-by-case basis." *Commonwealth v. Bonner*, 135 A.3d 592, 603 (Pa.Super. 2016) (citations omitted).

This Court has held that "a claim of inadequate consideration of mitigating factors does not raise a substantial question for our review." *Commonwealth v. Dortch*, 343 A.3d 298, 310 (Pa.Super. 2025) (*quoting Commonwealth v. Crawford*, 257 A.3d 75, 79 (Pa.Super. 2021)). Thus, we find that Appellant has not raised a substantial question for our review and has failed to preserve a challenge to the discretionary aspects of sentencing.

Even assuming *arguendo* that Appellant has raised a substantial question for review, he has failed to show he is entitled to relief. Before the trial court imposed its sentence, Appellant was given the opportunity at the sentencing hearing to speak on his own behalf in which he explained that he "suffer[s] from addiction" and would "continue to fight [his] addiction";

Appellant also provided details as to the multiple certificates he had earned while incarcerated. N.T., 12/19/23, at 10-11.

Thereafter, the trial court noted that it had considered Appellant's efforts and hoped Appellant would "continue to make progress" to improve his life and work towards rehabilitation. *Id.* at 12. The trial court also had considered a presentence investigation (PSI) report. Where the trial court has the benefit of a PSI report, "we shall ... presume that the sentencing judge was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors." *Commonwealth v. Antidormi*, 84 A.3d 736, 761 (Pa.Super. 2014) (citation omitted).

Although the prosecution had requested that Appellant be given sentences in the aggravated range, the trial court found that standard range sentences would be appropriate to achieve the sentencing goals of retribution and rehabilitation as well as protecting the public. In fact, the trial court's individual sentences fell in the low end of the standard range and most of the sentences were set to run concurrently. In its Rule 1925(a) opinion, the trial court indicated that "had [it] not considered the mitigating factors, such as the history of [Appellant's] substance abuse, the sentence would have been significantly longer." T.C.O. at 21. Thus, the trial court properly exercised its discretion in imposing Appellant's sentence.

### Challenge to Denial of Appellant's Request for Bail Modification

Appellant also claims that the trial court abused its discretion in denying his request for unsecured or nominal bail following sentencing. Before we

reach the merits of Appellant's specific arguments, it is helpful to review the record to assess what bail obligations were imposed in this case. After Appellant was charged in July 2022, the trial court initially ordered that Appellant's secured bail be set at $49,000. As Appellant could not post bail, he remained incarcerated at the Cumberland County Prison. On December 21, 2022, Appellant filed a motion to reduce his bail obligation which he characterized as excessive and unnecessary. It appears that on January 11, 2023, the trial court held a hearing on the motion to reduce bail and thereafter reduced Appellant's bail to $45,000.[16] Appellant still was unable to post bail.

After conviction and sentencing, Appellant again requested in his supplemental post-sentence motion that his bail obligation be modified from $45,000 to unsecured or nominal bail so that he could be at liberty on bail pending review of his post-sentence motion and pending a future appeal. On June 10, 2024, the trial court issued an order denying Appellant's post-sentence motion in its entirety, indicating that it would issue a "full, discursive" opinion thereafter. Before the trial court could issue an opinion explaining its rationale for denying the post-sentence motion, Appellant filed this appeal.

Pennsylvania Rule of Criminal Procedure Rule 521, which governs bail procedures after a finding of guilt, provides that "[w]hen a criminal defendant has been convicted and sentenced to two years or more of imprisonment (but

_____

[16] Although Appellant admits that the trial court held a hearing on this motion to modify his bail on January 11, 2023, the transcript of this hearing was not included in the certified record.

not life imprisonment or death), 'the defendant shall not have the same right to bail as before verdict, but bail may be allowed in the discretion of the judge.'" ***Commonwealth v. Garcia***, 311 A.3d 1138, 1148–49 (Pa.Super. 2024) (*quoting* Pa.R.Crim.P. 521(B)(2)).  Rule 521(D) states the following with respect to the modification of bail:

> **(D) Modification of Bail Order After Verdict or After Sentencing**
>
> (1) When a defendant is eligible for release on bail after verdict or after sentencing pursuant to this rule, the existing bail order may be modified by a judge of the court of common pleas, upon the judge's own motion or upon motion of counsel for either party with notice to opposing counsel, in open court on the record when all parties are present.
>
> (2) The decision whether to change the type of release on bail or what conditions of release to impose shall be based on the judge's evaluation of the information about the defendant as it relates to the release criteria set forth in Rule 523. The judge shall also consider whether there is an increased likelihood of the defendant's fleeing the jurisdiction or whether the defendant is a danger to any other person or to the community or to himself or herself.
>
> (3) The judge may change the type of release on bail, impose additional nonmonetary conditions as provided in Rule 527, or, if appropriate, impose or increase a monetary condition as provided in Rule 528.

Pa.R.Crim.P. 521(D).

Appellant asserts that the trial court abused its discretion in "denying [him] bail following his sentencing." Appellant's Brief, at 14.  Appellant argues that the trial court's bail determination should be reversed as it "failed to state on the record reasons" for denying his bail request after sentencing. Appellant points out that Rule 521(C), which is entitled "Reasons for Refusing or

Revoking Bail," includes the requirement that "[w]henever bail is refused or revoked under this rule, the judge shall state on the record the reasons for this decision." Pa.R.Crim.P. 521(C).

However, Appellant fails to recognize that Rule 521(C) is not directly applicable as the trial court never *denied* Appellant bail or *revoked* Appellant's bail. In fact, the trial court awarded Appellant bail from the commencement of this case upon the filing of charges. Appellant remained incarcerated from his arrest and through trial, sentencing, and this appeal as he was unable to post bail. Appellant is actually challenging the trial court's denial of his request for release on unsecured bail, which in other words, is a denial of Appellant's request to modify his bail.

We conclude that the trial court did not err in declining to modify Appellant's bail obligation. The trial court explained in its Rule 1925(a) opinion that it denied Appellant's request for unsecured bail as Appellant had just been given a sentence "in excess of a decade of incarceration" for Drug Delivery Resulting in Death, Involuntary Manslaughter, and other serious drug offenses. The trial court also noted that Appellant had evaded apprehension prior to trial. We cannot find the trial court abused its discretion in declining to release Appellant on unsecured bail.

### Ineffectiveness of Counsel Claims

Lastly, Appellant raises various claims of the ineffectiveness of his trial counsel. As noted above, our Supreme Court has consistently reaffirmed the general rule that "claims of ineffective assistance of counsel are to be deferred

to PCRA review; trial courts should not entertain claims of ineffectiveness upon post-verdict motions; and such claims should not be reviewed upon direct appeal." *Commonwealth v. Holmes*, 621 Pa. 595, 620, 79 A.3d 562, 576 (2013) (reaffirming *Grant*, 572 Pa. 48, 813 A.2d 726)).

However, our Supreme Court has recognized limited circumstances under which ineffectiveness claims can be raised in a post-sentence motion. The first exception applies to extraordinary circumstances in which "the claim of ineffectiveness is apparent from the record and meritorious to the extent that immediate consideration best serves the interests of justice." *Commonwealth v. Delgros,* 646 Pa. 27, 31, 183 A.3d 352, 355 (2018) (citing *Holmes*, 621 Pa. 595, 79 A.3d 562, 563–64)). The second exception applies "where there is good cause shown and the defendant knowingly and expressly waives his entitlement to seek subsequent PCRA review from his conviction and sentence." *Delgros*, 646 Pa. at 31, 183 A.3d at 355 (citing *Holmes*, 621 Pa. 595, 79 A.3d 562, 563–64)). The Supreme Court also recognized a third exception allowing "trial courts to address claims challenging trial counsel's performance where the defendant is statutorily precluded from obtaining subsequent PCRA review." *Delgros*, 183 A.3d 361.

With respect to the second exception (good cause/PCRA waiver exception), the *Holmes* court specifically explained that:

> where the defendant seeks to litigate multiple or prolix claims of counsel ineffectiveness, including non-record-based claims, on post-verdict motions and direct appeal, we repose discretion in the trial courts to entertain such claims, but only if (1) there is good cause shown, and (2) the unitary review so indulged is

preceded by the defendant's knowing and express waiver of his entitlement to seek PCRA review from his conviction and sentence, including an express recognition that the waiver subjects further collateral review to the time and serial petition restrictions of the PCRA. In other words, *we adopt a paradigm whereby unitary review may be available in such cases only to the extent that it advances (and exhausts) PCRA review in time.*

**Holmes**, 621 Pa. at 598–99, 79 A.3d 562, 563–64 (emphasis added).

As noted above, it appears that the trial court attempted to allow Appellant to litigate his claims of ineffectiveness of counsel raised in his post-sentence motion under the second **Holmes** exception as the trial court found good cause had been shown and that Appellant had participated in an oral colloquy in which he waived his right to raise ineffectiveness challenges in any future PCRA petition. N.T., 4/29/25, at 4-6.

However, Appellant's waiver colloquy was inadequate as the trial court only notified Appellant that seeking unitary review would foreclose Appellant's right to raise future ineffectiveness claims; **Holmes** provided that such unitary review of ineffectiveness claims in a post-sentence motion "should only proceed where accompanied by a knowing, voluntary, and express waiver of *PCRA review*." **Holmes,** 621 Pa. at 622, 79 A.3d at 578 (emphasis added). The Supreme Court in **Holmes** explained that "[p]ermitting broad and unitary review where there is a waiver of PCRA rights does not raise the prospect of arbitrarily affording some defendants two rounds of collateral review as of

right, while denying that option to other defendants; such a rule merely advances PCRA review."[17] *Id.*

Further, the *Holmes* court clarified that:

to ensure that the unitary review described here would not offer a benefit (beyond acceleration) not available to defendants who do not receive such review, the accompanying PCRA waiver must embrace more than exhaustion of the defendant's first PCRA petition, but instead must make clear that **any** further collateral attack is subject to the time-bar restrictions of Section 9545(b) (*i.e.,* petition must be filed within sixty days of date new claim could have been presented and must fall within one of three exceptions: government interference; new facts; new constitutional right of retroactive effect).

*Id.* at 624, 79 A.3d 562, 579 (emphasis in original).

As the trial court did not inform Appellant that the unitary review of his ineffectiveness claims would require an exhaustion of his first PCRA petition and further collateral attacks would be subject to the PCRA's time-bar restrictions, his colloquy was deficient and did not satisfy the good cause/PCRA waiver exception set forth in *Holmes*. Thus, we conclude deferral of Appellant's ineffective assistance of counsel claims to the PCRA is the appropriate remedy. This will prevent the type of "extra round of collateral attack for certain defendants, unauthorized by the General Assembly," which

---

[17] In *Holmes*, the Supreme Court expressly disapproved of expansions of its previous decision in *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831 (2003), which had allowed a defendant to raise ineffectiveness claims as a direct challenge to the verdict. The *Holmes* court recognized that the holding in *Bomar* should be limited to the facts of that case as it was litigated before *Grant* was decided and at a time when new counsel entering a case upon post-verdict motions was required to raise ineffectiveness claims at the first opportunity.

*Holmes* expressly rejected, and produce a more appropriate judicial treatment of Appellant's ineffective assistance of trial counsel claims. *Id*. at 619, 79 A.3d at 576.

For the foregoing reasons, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/14/2025